IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ROBERT GARY MOORE,                    *

    Plaintiff,                          *

        v.                            *          Civil Action No. DKC-22-1705

WARDEN OF W.C.I., *et al.*,            *

    Defendants.                         *
                      ***

**MEMORANDUM OPINION**

Self-represented Plaintiff Robert Gary Moore, an inmate presently incarcerated at Western Correctional Institution ("WCI") in Cumberland, Maryland, filed the above-captioned civil rights action pursuant to 42 U.S.C. § 1983 against the Maryland Department of Public Safety and Correctional Services ("DPSCS") Commissioner and WCI Warden Shane Weber (collectively, the "Correctional Defendants"); Wexford Health Services, Inc. ("Wexford"), Sierra Nolan, Krista Self, and Holly Hoover (collectively, the "Wexford Defendants"); Brittanii Manston, Ryan Browning, and Dr. Kasahun Temesgen (collectively, the "Corizon Defendants");[1] Baltimore Central Booking & Intake Center ("BCBIC") Acting Warden Paige Jones;[2] "Medical Health Services for Baltimore;" and "Doctor for City Jail."   ECF No. 6.   In Mr. Moore's Amended

---

[1]   Wexford was the contracted medical provider for DPSCS inmates until December 31, 2018.  Beginning January 1, 2019, Corizon Health replaced Wexford, and, on May 5, 2022, YesCare replaced Corizon.  *See* ECF No. 23-1 at 7.  Thus, to the extent that Mr. Moore raises claims against medical staff regarding events that took place before January 1, 2019, his claims are against the Wexford Defendants, and any claims stemming from events that took place between January 1, 2019, and May 4, 2022, are against the Corizon Defendants.  Mr. Moore has not named YesCare as a Defendant in this matter; however, some of the individual Defendants remained YesCare employees.

[2]   Warden Jones was originally identified as "Head Director of City Jail."  *See* ECF No. 1 at 1.  The Clerk will be directed to amend the docket accordingly.

Complaint,[3] he alleges that staff at BCBIC improperly discontinued his blood thinners in 2012, Wexford staff misdiagnosed him and rendered improper medical care prior to 2020, and medical staff at WCI and Jessup Correctional Institution ("JCI"), where he was previously housed, were deliberately indifferent to his medical needs. *Id.* Mr. Moore seeks injunctive relief and monetary damages. *Id.* at 7-8.

The Correctional Defendants, Wexford Defendants, Corizon Defendants, and Warden Jones have all filed motions to dismiss or, alternatively, for summary judgment. ECF Nos. 23, 25, 30, 31, 49. Mr. Moore responded to the earlier-filed motions with a declaration "under sworn and written oath." ECF Nos. 28, 34. In addition, Mr. Moore filed several motions, titled as motions for injunctive relief, wherein he asks the court to direct DPSCS to provide additional video recordings. ECF Nos. 29, 41, 51, 55, 60. Pursuant to this court's Order (ECF No. 54), DPSCS opposed the motion at ECF No. 51 (ECF No. 61). Mr. Moore also sought leave to add Dr. Robert Williams and Nurses Tameila Benegar and Priscilla Cobb as Defendants. ECF No. 28.

Having reviewed the submitted materials, the court finds that no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2021). For the reasons set forth below, Defendants' pending motions to dismiss or for summary judgment will be granted and Mr. Moore's motion for injunctive relief, which DPSCS opposed, will be denied. Mr. Moore's remaining requests will be construed as motions for production of evidence and granted. Although "Medical Health Services for Baltimore" and "Doctor for City Jail" were neither properly identified nor served, Mr. Moore's claims against them will be dismissed pursuant to 28 U.S.C. § 1915A. Mr. Moore's request to add Dr. Robert Williams and Nurses Tameila Benegar and Priscilla Cobb as Defendants will be

---

[3]     The general rule is, "an amended pleading ordinarily supersedes the original and renders it of no legal effect." *Young v. City of Mt. Ranier*, 238 F.3d 567, 572 (4th Cir. 2001) (citation omitted).

granted, and Mr. Moore will be directed to file a Second Amended Complaint, listing his claims against those individuals, within 28 days of the date of this Memorandum Opinion and accompanying Order.

**BACKGROUND**

A.      **Plaintiff's Allegations**

In his Amended Complaint, Mr. Moore alleges that while he was incarcerated at BCBIC in 2012, medical staff discontinued his blood thinners despite learning from his medical records that he "had five factor blood" and was prone to blood clots.  ECF No. 6 at 2.  Mr. Moore was transferred to North Branch Correctional Institution ("NBCI"), where he suffered problems with his legs, stomach, and breathing.  *Id.* at 2-3.  Mr. Moore attributed his ailments to his blood condition, but Wexford staff did not agree.  *Id.* at 2.  According to Mr. Moore, not once did Defendants request a sonogram, order a blood count, or analyze his blood, and his sick calls went unanswered.  *Id.*

In 2020, Mr. Moore was transferred to JCI, where he informed the Warden and DPSCS Commissioner about his blood clots.  *Id.* at 3.  During a sick call visit on June 7, 2021, a nurse noticed that Mr. Moore was breathing rapidly and "his pulse was too high."  *Id.* at 3-4.  The nurse informed a doctor, who only sent Mr. Moore back to his housing unit.  *Id.*  On June 8, 2021, Mr. Moore fell unconscious in his cell due to "massive blood clots in both legs and both lungs."  *Id.* As a result, he underwent surgery at Western Maryland Hospital on the following day.  *Id.* at 3.

On June 14, 2022, Mr. Moore was transferred from JCI to WCI.  *Id.* at 4.  During intake, Mr. Moore informed a nurse of his chronic conditions and indicated that he was "not feeling mentally stable."  *Id.*  Due to his mental state, Mr. Moore refused to be housed in general

3

population.  *Id.* at 5.  As a result, he was placed in "a holding cell with only a mattress with no bed roll for six days straight."[4]  *Id.*

Mr. Moore alleges that from the time of his intake evaluation until the time he signed his Amended Complaint on July 18, 2022, he had not seen a practitioner or doctor about his chronic conditions and his sick calls went unanswered.  *Id.* at 6.  Specifically, no one responded to his requests for a cardio diet, blood thinner refills, and prescription for cholesterol medication.  *Id.*  On June 28, 2022, a nurse at WCI informed him that "she didn't have any blood thinners for him and that [the] prescription was never refilled."[5]  *Id.* at 7.

### B.    Correctional Defendants' Response

Defendant Weber, the Warden at WCI, states that he is not personally involved in the provision of medical care to inmates.  Decl. of Weber, ECF No. 25-2 at ¶¶1-2.  In particular, he has no authority to make decisions regarding any inmate's medical care and he has no authority to recommend that any particular procedure be performed.  *Id.* at ¶2.  Rather, an inmate can fill out a sick call slip to seek medical evaluation and treatment.  *Id.* at ¶3.  Private medical contractors collect all sick call slips and determine the appropriate response.  *Id.*  When responding to inmates' grievances about the medical care provided to them, Warden Weber and his staff rely on the assessments trained medical staff.  *Id.* at ¶4.

---

[4]    Despite this statement, Mr. Moore does not appear to raise conditions of confinement claims but instead focuses on the allegedly deficient medical care.

[5]    By Order dated August 8, 2022, the court directed counsel for DPSCS to indicate whether it had preserved video recordings from June 28, July 21, July 23, and July 25, 2022, as relevant to Mr. Moore's claims that he did not receive necessary medication.  ECF No. 8.  On August 22, 2022, counsel stated that footage from those dates had been preserved (ECF No. 11) and on October 25, 2022, the Litigation Coordinator at WCI stated that Mr. Moore had viewed them (ECF No. 27).  Thereafter, Mr. Moore requested video recordings for several other dates he alleges he was not given blood thinners.  ECF Nos. 10, 28, 29, 41, 51, 55, 60.

According to Jason Clise, a Correctional Case Management Specialist II at WCI, Mr. Moore filed an Administrative Remedy Procedure ("ARP") grievance on June 29, 2022, regarding the medical staff's failure to provide blood thinners on the day prior. ECF No. 25-3 at 1-2. That ARP was denied on July 18, 2022, after a review of medical records indicated that he did receive his medication as ordered on June 28, 2022. *Id.* at 3. Thereafter, Mr. Moore did not appeal to the Commissioner or the Inmate Grievance Office. *Id.* at 1.

### C.    Corizon Defendants' Response

Defendant Hoover is a Certified Registered Nurse Practitioner who was employed by Wexford until December 31, 2018, and by Corizon from January 1, 2019, to February 5, 2022. Most of her contact with Mr. Moore was during Wexford's contract period. She saw Mr. Moore at NBCI on October 24, 2017, when he was scheduled for an esophagogastroduodenoscopy and colonoscopy. Medical Records, ECF No. 23-7 at 271. At that time, Mr. Moore's documented chronic problems were constipation, hyperplasia of prostate, and synovium/tenson/bursa disorder. *Id.* Ms. Hoover states that Mr. Moore never informed her that he had a history of blood clots, and she did not see it listed in his medical records. Decl. of Hoover, ECF No. 23-3 at ¶5.

Ms. Hoover saw Mr. Moore again on March 9, 2018, and April 6, 2018, for complaints of abdominal discomfort. ECF No. 23-7 at 275-76, 280-81. She evaluated him, ordered labs and an abdominal x-ray, and adjusted his medication. *Id.* During the latter visit, Mr. Moore reported having a knot on his leg but refused to provide any additional details. *Id.* at 280.

On April 8, 2018, Ms. Hoover submitted a consultation request for an abdominal and pelvic CT scan. *Id.* at 284. Subsequently, however, Mr. Moore refused a blood draw, stool sample testing, a physical evaluation, and an ultrasound and CT scan, stating that he felt disrespected by the medical staff. *Id.* at 287-90. Ms. Hoover saw Mr. Moore again on August 12, 2018, and

5

September 19, 2018, regarding his abdominal pain.  *Id.* at 291-94.  During Mr. Moore's final visit with Ms. Hoover in September, he stated that he did not know why he refused treatment before and indicated that he would be willing to complete the labs now.  *Id.* at 293.  Nonetheless, after Corizon became the contracted medical provider at NBCI, Mr. Moore refused a health assessment with Ms. Hoover on April 19, 2019.  *Id.* at 151.

While at NBCI, Mr. Moore continued to see other members of the medical staff.  On May 13, 2019, he saw Michael Klepitch, RN with complaints of coughing up blood.  *Id.* at 152-53.  He was diagnosed with a possible upper respiratory infection, and a chest x-ray was ordered to rule out pneumonia.  *Id.*  Prescriptions for azithromycin and Tylenol were also provided.  *Id.* On May 20, 2019, the x-ray results came back showing no acute cardiopulmonary disease.  *Id.* at 157.  On June 1, 2019, Mr. Moore saw Robin Shively, RN with complaints of constipation.  *Id.* During that visit, the x-ray results were reviewed with him, and Colace was prescribed.  *Id.*  On October 16, 2019, Mr. Moore refused a diet renewal, and on December 10, 2019, he refused his exam with Ms. Hoover for complaints of abdominal pain.  *Id.* at 160, 162.

On March 16, 2020, Mr. Moore did not attend a scheduled physical prep with Mr. Klepitch. *Id.* at 169.  On April 8, 2020, he saw William Raynor, RN for an ongoing cough.  *Id.* at 170.  Upon examination, no labored breathing was observed, his breath sounds were clear, there was no irritation of his eyes, and his mucus membranes were pink and moist.  *Id.*  Although Mr. Moore's throat appeared irritated, no inflammation or discharge was observed.  *Id.*  Thus, finding no signs or symptoms of respiratory infection, Mr. Raynor provided medication for allergy treatment.  *Id.* On September 16, 2020, Mr. Moore was transferred to JCI.  *Id.* at 179.

Dr. Temesgen, a medical doctor, was employed by Corizon as the Regional Medical Director ("RMD") for the Jessup Region between January 1, 2019, and May 4, 2022, and he has

been employed by YesCare in the same role since May 5, 2022.  Decl. of Temesgen, ECF No. 23-4 at ¶2.  As the RMD, Dr. Temesgen's role is more administrative in nature, and he does not typically see inmates or provide medical treatment.  *Id.* ¶ 5.  Rather, he reviews Nonformulary Drug Requests ("NFDRs") submitted by the providers.  *Id.*  His review of the records shows that his only involvement with Mr. Moore's care was approving the NFDRs submitted by other providers.  *Id.*

According to Dr. Temesgen, Mr. Moore saw Gerald Belebenma, RN on January 15, 2021, with complaints of lower abdominal pain.  ECF No. 23-7 at 3.  Following evaluation, Mr. Moore declined pain medication but was referred to a provider and was enrolled in chronic care for frequent follow-up.  *Id.*  A week later, Mr. Moore saw Dr. Robert Williams for chronic care.  *Id.* at 4.  During that time, it was noted that Mr. Moore had a history of chronic constipation, bloating, and excessive gas for many months.  *Id.* at 6.  He was not taking any medications for his symptoms; thus, Dr. Williams prescribed Metamucil and magnesium citrate as needed.  *Id.* at 7.

On February 23, 2021, Mr. Moore saw Bernard Alenda, NP for a sick call regarding abdominal discomfort.  *Id.* at 9.  After Mr. Moore reported a history of gastritis for the past four to five years, Mr. Alenda submitted a NFDR for pantoprazole, which Dr. Temesgen approved.  *Id.* at 9-11.  Mr. Alenda also ordered labs, including a basic lipid panel, comprehensive metabolic panel, urinalysis, and a complete blood count ("CBC") with differential platelet count.  *Id.* at 10.  On March 4, 2021, Mr. Moore refused a physical.  *Id.* at 15.

On May 11, 2021, Mr. Moore saw Simone Shaw-Kent, RN for a medical emergency after he passed out in the REC room.  *Id.* at 18.  Mr. Moore stated that he had extreme pain in the left chest and both lower extremities.  *Id.*  A subsequent EKG showed sinus tachycardia, right bundle branch block, left posterior fascicular block, and bifascicular block.  *Id.*  At that time, it was noted

that he had a history of deep vein thrombosis ("DVT") in both legs and pulmonary embolism ("PE"). *Id.* Mr. Alenda, who was also present, discussed Mr. Moore's condition with the on-call doctor, who recommended sending him out via 911. *Id.* at 19.

Mr. Moore was admitted to the Baltimore Washington Medical Center on May 11, 2021, and discharged on May 15, 2021. *Id.* at 111-37. The discharge notes state that he was admitted for a large blood clot in the lung, also known as a PE. *Id.* at 112. Although the blood clot created significant strain on the heart, an echocardiogram did not reveal any signs of heart failure. *Id.* at 117. It was also noted that Mr. Moore had a mass on his left knee that appeared "negative for suspicious lesion, but rather may be related to old Osgood-Schlatter disease or old fracture." *Id.* at 123.

Mr. Moore's PE was treated with a heparin drip during admission, but he transitioned to an oral blood thinner called Xarelto. *Id.* at 117. Because he had an extensive history of clots with possible underlying genetic mutation that made him more predisposed to clots, he needed to remain on anticoagulation permanently. *Id.* Upon discharge, Mr. Moore was directed to take Xarelto 15 mg twice daily for the next 21 days, then 20 mg once daily indefinitely. *Id.* Contrary to Mr. Moore's assertion that he had surgery while hospitalized, the discharge records do not show that he had any surgery. *See id.* at 111-37.

Following discharge from the hospital, Mr. Moore saw Sanya Adebayo, RN at the Jessup Regional Infirmary ("JRI") on May 15, 2021. *Id* at 32-33. NFDRs for Xarelto (Rivaroxaban) for 21 days and Tamsulosin (Flomax) for 14 days were submitted, which Dr. Yonas Sisay approved, on behalf of Dr. Temesgen. *Id.* at 34. On May 18, 2021, a pharmacist recommended continuing Xarelto 15 mg for 21 days, then switching to 20 mg daily with food indefinitely per the hospital

discharge plan.  *Id.* at 51.  The pharmacist also recommended monitoring CBC and reporting any signs or symptoms of bleeding.  *Id.*

On May 19, 2021, Mr. Moore saw Matthew Carpenter, PA in JRI, during which time he reported some bloating, tingling sensations in his upper chest, and sharp pain in his left shoulder. *Id.* at 55.  Mr. Moore denied dizziness, sweating, shortness of breath, or other chest pain, and reported compliance with anticoagulation medication.  *Id.*  Mr. Moore also reported some tingling of the left knee with radiation down the leg.  *Id.*  He reported having pain for years, with a left knee injury over 10 years ago.  *Id.*  He also reported having a knot appear four years ago which he believed was contributing to the pain.  *Id.*  Mr. Carpenter noted that an ultrasound on May 11, 2021, did not mention any concerning masses in Mr. Moore's lower left extremities.  *Id.*  On May 20, 2021, Mr. Carpenter discharged Plaintiff from JRI back to JCI.  *Id.* at 62.

On September 27, 2021, Motunrayo Adegorusi, NP submitted a NFDR for Xarelto 20 mg x 120 days, and Dr. Temesgen approved the request.  *Id.* at 70.  During a chronic care visit with Ms. Adegorusi on October 16, 2021, Mr. Moore complained about a knot behind his leg which he said the hospital neglected during the emergency visit.  *Id.* at 74.  While Ms. Adegorusi was attempting to review the hospital summary, Mr. Moore proceeded to ask for something for his face.  *Id.*  Ms. Adegorusi politely informed Mr. Moore to wait a minute while she read the hospital summary to find information about the knot, but Mr. Moore laughed and continued to talk.  *Id.* When Ms. Adegorusi asked Mr. Moore whether his heart health or his face was more important, Mr. Moore chose his face then began to call Ms. Adegorusi stupid and naïve.  *Id.*  In response, Ms. Adegorusi told Mr. Moore that his medications had been reviewed and renewed, and directed him to leave the clinic.  *Id.*

On December 2, 2021, Mr. Moore refused his sick call visit with Emmanuel Esianor, PA. *Id.* at 76.  On December 3, 2021, Ms. Adegorusi submitted a NFDR for Xarelto for 120 days, and Dr. Temesgen approved the request.  *Id.* at 77.

On February 7, 2022, Mr. Moore saw Dr. Hamid Kiabayan for provider chronic care.  *Id.* at 85-87.  At that time, Mr. Moore denied chest pain, palpitation, shortness of breath, nausea, vomiting, and visual disturbances but complained about a knot behind his left knee, which he said was felt for the first time six years prior.  *Id.*  Mr. Moore was worried that it was a blood clot and abscess.  *Id.*  Dr. Kiabayan reviewed previous labs with him, refilled his medication for the next four months, and ordered additional labs.  *Id.*  Dr. Kiabayan submitted a NFDR for Xarelto for 120 days, which Dr. Temesgen approved.  *Id.*  Three days later, Mr. Moore saw Mr. Esianor during a sick call and requested refills of Metamucil and Xarelto.  *Id.* at 88.  However, because the medication had recently been refilled, his request was denied.  *Id.*  Thereafter, Mr. Moore became uncooperative and did not allow the provider to take his vitals.  *Id.*

On April 21, 2022, Mr. Moore refused a physical exam with Mr. Alenda, and on May 24, 2022, he did not attend his chronic care appointment.  *Id.* at 90-91.  On June 14, 2022, Mr. Moore was transferred from JCI to WCI.  *Id.* at 92-96.

On June 15, 2022, Mr. Moore refused his chronic care appointment at WCI.  *Id.* at 97.  The Medication Administration Record ("MAR") for June 2022 shows that Xarelto was prescribed from February 7, 2022, to June 30, 2022, and it was renewed by Dr. Jaleh Daee from June 23, 2022, until September 30, 2022.  *Id.* at 192.  The MAR does not show that Plaintiff was administered Xarelto on June 25, 2022, although it shows he received it the other days while at WCI in June 2022.  *Id.*  The July 2022 MAR shows that Plaintiff continued to receive his Xarelto with possible missed doses on July 19 and 25, 2022.  *Id.* at 269.

On August 19, 2022, Mr. Moore saw Dr. Masoud Djahanmir for a provider visit.  *Id.* at 105-08.  He wanted to be placed back on a cardiovascular diet and complained of blurred vision and constipation but no other issues.  *Id.* at 105.  Dr. Djahanmir noted that the Xarelto prescription was current from June 23, 2022, until September 30, 2022.  *Id.*  He also referred Mr. Moore to optometry, ordered labs, restarted Flomax and Lipitor, prescribed Dulcolax for constipation, and continued Xarelto.  *Id.* at 105-08.  The August 2022 MAR reflects that Mr. Moore continued to receive his Xarelto with possible missed doses on August 4, 6, 13, and 28, 2022.  *Id.* at 267.  Likewise, the September 2022 MAR shows he continued to receive Xarelto.  *Id.* at 265.

Defendant Manston, an Administrative Assistant at WCI, states that she does not provide care to inmates, and she has never met Mr. Moore.  Decl. of Manston, ECF No. 23-5 at ¶2.  On July 20, 2022, Ms. Manston provided a Certification of Records and some of Mr. Moore's medical records in response to a request from the Attorney General's Office.  *Id.* at ¶3.  Ms. Manston disputes Mr. Moore's allegation that she provided fraudulent charts regarding his medication records.  *Id.*

Defendant Browning is a Licensed Practical Nurse currently employed at WCI.  Decl. of Browning, ECF No. 23-6 at ¶2.  While working in that capacity, he does not recall ever seeing or providing treatment to Mr. Moore, nor could he locate any medical record indicating as much.  *Id.* at ¶ 4.  One of Mr. Browning's duties is to review ARPs filed by inmates regarding their medical care.  *Id.* ¶ 5.  Upon reviewing records, Mr. Browning found that he responded to Mr. Moore's grievance on July 11, 2022.  *Id.*  In that ARP, Mr. Moore had complained that he was not receiving his prescribed blood thinner Xarelto.  *Id.*  As part of Mr. Browning's investigation, he reviewed the MARs to see if Mr. Moore was receiving his Xarelto.  *Id.*  As previously noted, the June and July MARs showed that Mr. Moore was receiving the medication.  *Id.*

11

**STANDARDS OF REVIEW**

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim. However, the complaint must allege sufficient facts to establish those elements." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted).

When the moving party styles its motion as a motion to dismiss or, in the alternative, motion for summary judgment, as is the case here, and attaches additional materials to the motion, the nonmoving party is, of course, aware that materials outside the pleadings are before the court, and the court can treat the motion as one for summary judgment. *See Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir. 1998).

Rule 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247-48 (emphasis in original). The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v.*

*Cotton*, 572 U.S. 650, 656-57 (2014) (per curiam) (citation and quotation omitted), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015).  At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial."  *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)).

## DISCUSSION

Mr. Moore asserts a violation of the Eighth Amendment for "deliberate indifference of medical staff to a serious medical condition."  ECF No. 6.  Construing the Amended Complaint liberally and in the light most favorable to Mr. Moore, his claims appear to be as follows: (1) BCBIC improperly discontinued his blood thinners in 2012; (2) Wexford staff failed to look into his blood condition while he was at NBCI; (3) medical staff at JCI failed to address his blood clots, causing an emergency transport to a hospital; and (4) upon his transfer to WCI, medical staff ignored his sick calls, failed to schedule evaluations, and failed to give him required blood thinners.

## I.     BCBIC Acting Warden Jones

Defendant Warden Jones has raised the affirmative defense that Mr. Moore's complaint is barred by the statute of limitations.  ECF No. 49-1.  There is no federal statute of limitations for actions under 42 U.S.C. § 1983, and it is well-settled that the limitations period for § 1983 claims is to be determined by the analogous state law statute of limitations.  *See Wallace v. Kato*, 549 U.S. 384, 387 (2007); *Burnett v. Grattan*, 468 U.S. 42, 49 (1984).  In Maryland, the applicable statute of limitations is three years from the date of the occurrence.  *See* Md. Code Ann., Cts. & Jud. Proc., § 5-101 (providing that "[a] civil action at law shall be filed within three years from the date it accrues").

13

Although the state statute of limitations applies, the question of when a cause of action has accrued under § 1983 is a federal question. *Nasim v. Warden, Md. House of Corr.*, 64 F.3d 951, 955 (4th Cir. 1995) (citing *Cox v. Stanton*, 529 F.2d 47, 50 (4th Cir. 1975)). The date of accrual occurs "when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action." *Id*. (citing *United States v. Kubrick*, 444 U.S. 111, 122-24 (1979)).

The three-year statute of limitations may be tolled for equitable reasons, but only in "those rare instances where - due to circumstances external to the party's own conduct - it would be unconscionable to enforce the limitation period against the party and gross injustice would result." *Rouse v. Lee*, 339 F.3d 238, 246 (4th Cir. 2003) (en banc) (citing *Harris v. Hutchinson*, 209 F.3d 325, 330 (4th Cir. 2000)). Equitable tolling is unavailable to a plaintiff who has not been diligent in protecting his or her rights; rather, the plaintiff must establish that he or she has been prevented from asserting those rights. *See Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 555 (1974). Under Maryland law, the statute of limitations is strictly construed. "Absent legislative creation of an exception to the statute of limitations, we will not allow any 'implied and equitable exception to be engrafted upon it.'" *Hecht v. Resolution Tr. Corp.*, 635 A.2d 394, 399 (Md. 1994) (quoting *Booth Glass Co. v. Huntingfield Corp.*, 500 A.2d 641, 645 (Md. 1985)).

Here, Mr. Moore faults Warden Jones for failing to intervene on his behalf when his prescription for blood thinners was discontinued in 2012. Because Mr. Moore did not bring this action until 2022, the statute of limitations now bars consideration of his claims against Warden Jones. Mr. Moore does not assert that he was prevented from timely filing this suit. As such, equitable tolling does not apply here. Thus, his claims against Warden Jones will be dismissed.

Similarly, with regard to Medical Health Services for Baltimore and Doctor for City Jail (John Doe), both of whom were neither identified nor served, it plainly appears on the face of the Amended Complaint that the statute of limitations bars consideration of the claims against them as well. *See Eriline Co. S.A. v. Johnson*, 440 F.3d 648, 655 (4th Cir. 2006) ("we have recognized that a statute of limitations defense may properly be raised sua sponte by a district court . . . when such a defense plainly appears on the face of . . . a complaint filed in forma pauperis pursuant to 28 U.S.C. § 1915") (citing *Nasim v. Warden, Md. House of Correction*, 64 F.3d 951, 953–54 (4th Cir.1995)).  Thus, they will be dismissed from this suit without requiring service.  *See* 28 U.S.C. § 1915(e)(2), 1915A(b) (2018) (requiring a court to screen a complaint filed by a prisoner *in forma pauperis* and dismiss it if it fails to state a plausible claim for relief).

## II.    Correctional Defendants

The Correctional Defendants argue that Mr. Moore did not exhaust administrative remedies before filing suit.  Alternatively, they assert that Mr. Moore fails to state an Eighth Amendment claim against them in connection with his medical care and fails to establish supervisory liability. The Correctional Defendants also argue that they are entitled to qualified immunity.

With regard to the exhaustion argument, if Mr. Moore's claims were not properly presented through the administrative remedy procedure, they must be dismissed pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e.

The Prisoner Litigation Reform Act provides, in pertinent part:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).  For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or

adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h).  The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see Chase v. Peay*, 286 F.Supp.2d 523, 528 (D. Md. 2003), *aff'd*, 98 Fed. App'x. 253 (4th Cir. 2004).

Although exhaustion under § 1997e(a) is not a jurisdictional prerequisite, the plaintiff must nonetheless exhaust before this court will hear the claim.  *See Jones v. Bock*, 549 U.S. 199, 215-16 (2007); *Anderson v. XYZ Corr. Health Servs., Inc.*, 407 F.2d 674, 682 (4th Cir. 2005).  The exhaustion requirement "allow[s] a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Bock*, 549 U.S. at 219.  It is designed so that prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process.  *Chase*, 286 F. Supp. 2d at 530.

Because the court may not consider an unexhausted claim, *see Bock*, 549 U.S. at 220, in this very real sense, exhaustion prior to federal suit is mandatory.  *Ross v. Blake*, 578 U.S. 632, 639 (2016).  Therefore, a court ordinarily may not excuse a failure to exhaust.  *Id.* (citing *Miller v. French*, 530 U.S. 327, 337 (2000) (explaining "[t]he mandatory 'shall'. . . normally creates an obligation impervious to judicial discretion")).

Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006).  Importantly, however, the court must ensure that "any defects in exhaustion were not

procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006). Moreover, an inmate need only exhaust "available" remedies. 42 U.S.C. § 1997e(a); *see Ross*, 578 U.S. at 637. An administrative remedy is not "available" where the prisoner, "through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008) (citing *Aquilar-Avellaveda*, 478 F. 3d at1225); *Kaba*, 458 F.3d at 684.

Inmates housed at an institution operated by DPSCS may avail themselves of the administrative grievance process which is designed for "inmate complaint resolution." *See generally* Md. Code (2008 Repl. Vol.), Correctional Services Article ("C.S."), §§ 10-201 *et seq.*; COMAR 12.07.01.01B(1) (defining ARP). If an ARP is filed and denied, the prisoner may appeal the denial within 30 days to the Commissioner of Correction. If the Commissioner of Correction denies the appeal, the prisoner may file a grievance with the IGO, also within 30 days. OPS.185.0002.05D; C.S. § 10-206(a); C.S. § 10-210; COMAR 12.07.01.05B. If the grievance is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing. C.S. § 10-207(b)(1); *see* COMAR 12.07.01.07B. An order of dismissal constitutes the final decision of the Secretary of DPSCS for purposes of judicial review. C.S. § 10-207(b)(2)(ii).

Here, it appears that Mr. Moore was aware of the administrative grievance process and the process was available to him, as he filed an ARP regarding the failure to provide his blood thinners by grievance dated June 29, 2022. Before the Warden could issue his decision regarding that grievance, Mr. Moore filed the instant suit. *Cf.* ECF No. 1-2 at 2 (indicating that Mr. Moore placed his Complaint in "Outgoing Inmate Mail" on July 5, 2022) *with* ECF No. 25-3 at 3 (showing that the Warden denied Mr. Moore's ARP on July 18, 2022). Because Mr. Moore failed completely to

exhaust his administrative remedies prior to filing federal suit, his claims against the Correctional Defendants are subject to dismissal without prejudice.

In his initial Complaint, Mr. Moore stated that he did not exhaust his administrative remedies because the claim was related to an immediately life threatening or emergency situation. ECF No. 1 at 3. "The PLRA does not contain an "emergency" exception to the exhaustion requirement." § 17:25. Emergency, 3 Rights of Prisoners § 17:25 (5th ed.) (citing *Horacek v. Caruso*, 2009 WL 125398 (W.D. Mich. 2009)); *see also United States v. Underwood*, No. CR TDC-18-0201, 2020 WL 1820092, at *2 (D. Md. Apr. 10, 2020) (stating that "the Court likewise may not create an exception not grounded in the statute itself"). "Nevertheless, in a genuine emergency, it is possible for an inmate to go directly to federal court without exhausting the prison grievance system to obtain a temporary restraining order pending the completion of the exhaustion process." *Id.* (citing *Roberts v. Neal*, 745 F.3d 232, 236 (7th Cir. 2014); *Vandiver v. Prison Health Services, Inc.*, 727 F.3d 580 (6th Cir. 2013); *Jackson v. District of Columbia*, 254 F.3d 262 (D.C. Cir. 2001); *Marvin v. Goord*, 255 F.3d 40 (2d Cir. 2001); *Evans v. Saar*, 412 F. Supp. 2d 519, 527 (D. Md. 2006); *see also Shakka v. Smith*, 28 F.3d 1210 (Table), 1994 WL 319217 at *1 n.1 (4th Cir. 1994) (recognizing that "district court granted the motion to excuse exhaustion").

Even if Mr. Moore had exhausted this claim, however, it would nonetheless fail on the merits because neither Warden Weber nor the DPSCS Commissioner personally participated in Mr. Moore's medical care. *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) (stating that liability under § 1983 attaches only upon personal participation by a defendant in the constitutional violation). Accordingly, the Correctional Defendants' motion shall be granted.

### III.    Wexford Defendants

Like Defendant Warden Jones, the Wexford Defendants also raise the affirmative defense that Mr. Moore's claims are barred by the statute of limitations.  ECF No. 30-1 at 8-9; ECF No. 31-1 at 9-10.  Wexford ceased to provide medical care to DPSCS inmates as of January 1, 2019, while Defendants Self and Nolan stopped working as health care providers for any DPSCS institution in August and December 2018, respectively.  *See generally* Aff. of Joe Ebbitt, ECF No. 31-3; Aff. of Self, ECF No. 30-5 at¶2; Aff. of Nolan, ECF No. 30-6 at ¶2.  As to Defendant Holly Hoover, Mr. Moore's medical records reflect that all of his meetings with her took place on or before September 19, 2018, when Wexford was the provider.[6]  Thus, any claims against the Wexford Defendants must have been brought by January 1, 2022.  As Mr. Moore did not initiate this suit until June 2022, the statute of limitations now bars consideration of his claims against them.

### IV.    Corizon Defendants

The Corizon Defendants seek dismissal under Federal Rule of Civil Procedure 12(b)(6), arguing that Mr. Moore fails to state a claim for deliberate indifference to a serious medical need or, alternatively, entry of judgment in their favor pursuant to Rule 56.  ECF No. 23-1.

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment.  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016).  To state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their

---

[6] In any event, Mr. Moore has not substantiated his claims that Ms. Hoover was aware that he suffered from blood clots and needed blood thinners.  At the time of Mr. Moore's meetings with Ms. Hoover, there was nothing in his medical chart to indicate as much.  Mr. Moore was scheduled to meet with Ms. Hoover on April 19, 2019, at which time she was a Corizon employee, but he refused to attend the health assessment.

failure to act, amounted to deliberate indifference to a serious medical need.  *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available.  *See Farmer v. Brennan*, 511 U.S. 825, 834-37 (1994); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).

Objectively, the medical condition at issue must be serious.  *Hudson v. McMillan*, 503 U.S. 1, 9 (1992).  A medical condition is serious when it is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Iko*, 535 F.3d at 241 (citation omitted).  As for the subjective component, "[a]n official is deliberately indifferent to an inmate's serious medical needs only when he or she subjectively knows of and disregards an excessive risk to inmate health or safety."  *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (quoting *Farmer*, 511 U.S. at 837).  The subjective knowledge requirement can be met through direct evidence of actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious."  *Scinto v. Stansberry*, 841 F.3d 219, 226 (4th Cir. 2016) (quoting *Farmer*, 511 U.S. at 842).

Deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness, and as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference."  *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844); *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999) ("Deliberate indifference is a very high standard—a showing of mere negligence will not meet it . . . [T]he Constitution is designed to deal with deprivations of rights,

not errors in judgments, even though such errors may have unfortunate consequences . . . To lower this threshold would thrust federal courts into the daily practices of local police departments."). Moreover, mere negligence or malpractice does not rise to the level of a constitutional violation. *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986) (citing *Estelle*, *supra*, 429 U.S. at 106).

An inmate's mere disagreement with medical providers as to the proper course of treatment also does not support a claim under the deliberate indifference standard. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *Wester v. Jones*, 554 F.2d 1285 (4th Cir. 1977). Rather, a prisoner-plaintiff must show that the medical provider failed to make a sincere and reasonable effort to care for the inmate's medical problems. *See Startz v. Cullen*, 468 F.2d 560, 561 (2d Cir. 1972); *Smith v. Mathis*, PJM-08-3302, 2012 WL 253438, at * 4 (D. Md. Jan. 26, 2012), *aff'd*, 475 F. App'x 860 (4th Cir. 2012).

Generally, "[a]n actionable deliberate-indifference claim does not require proof that the plaintiff suffered an actual injury. Instead, it is enough that the defendant's actions exposed the plaintiff to a 'substantial risk of serious harm.'" *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 210 (4th Cir. 2017) (quoting *Farmer*, 511 U.S. at 837). But, in a case involving a claim of deliberate indifference to a serious medical need, the inmate must show a "significant injury." *Danser v. Stansberry*, 772 F.3d 340, 346 n.8 (4th Cir. 2014).

With regard to the Corizon Defendants, Mr. Moore alleges that they failed to address his blood clots at JCI, causing the need for an emergency transport to a hospital, and upon his transfer to WCI, they ignored his sick calls, failed to schedule evaluations, and failed to give him required blood thinners. Even if Mr. Moore has shown that, objectively, he suffers from a serious medical condition, his claims fail.

Based on the record before the court, it appears that two of the named Corizon Defendants, Brittanii Manston and Ryan Browning, had no personal participation in the alleged wrongdoing. Ms. Manston, an Administrative Assistant at WCI, does not provide care to inmates and has never met Mr. Moore.  Meanwhile, Mr. Browning never treated Mr. Moore and could not locate any medical record indicating otherwise.  Neither has Mr. Moore disputed this statement.

Although Dr. Temesgen was involved in Mr. Moore's care, his role was limited to approving prescriptions presented to him for review.  In this case, requests for Mr. Moore's Xarelto prescription were presented to Dr. Temesgen on several occasions, which he approved.

In sum, there is no evidence that any of the current Corizon Defendants subjectively knew of and disregarded an excessive risk to Mr. Moore's health or safety.  Thus, they are entitled to summary judgment in their favor.

## V.    Mr. Moore's Motions

Mr. Moore has filed several motions, which he titled as motions for injunctive relief, wherein he asks the court to direct DPSCS to submit video recordings for certain dates when he allegedly did not receive blood thinners.  ECF Nos. 29, 41, 55, 60.  Specifically, he asks for surveillance videos of his cell from November 4, 2022 (ECF No. 29); December 20 and 21, 2022, and January 4, 2023 (ECF No. 41); and April 30, 2023 (ECF No. 55), all of which he reiterates in a separate motion (ECF No. 60).[7]

The court previously directed DPSCS to provide videos from June 28, 2022, as well as July 21, 23, and 25, 2022.  ECF No. 8.  DPSCS complied and submitted footage showing that on June 28, 2022, a nurse arrived on the tier at 5:49 p.m., stopped in front of Mr. Moore's cell at

---

[7]    Previously, he requested footage from July 27 and 28, 2022, as well as August 1, 11, and 12, 2022.  ECF No. 10.

5:50 p.m., whereupon the slot was opened, and the nurse appeared to set something down.  The nurse came back to the cell to talk at 5:53 p.m. and exited the tier at 5:54 p.m.  Video 22-WC-076, ECF No. 25.  On July 21, 2022, a nurse arrived on the tier with the medication cart around 6:12 p.m. and left the tier around 6:23 p.m. without stopping at Mr. Moore's cell.  *Id.* at Video 22-WC-077.  On July 23, 2022, a nurse arrived on the tier with the medication cart around 6:27 p.m. and left the tier around 6:37 p.m., again without stopping at Mr. Moore's cell.  *Id.* at Video 22-WC-078.  On July 25, 2022, a nurse arrived on the tier with the medication cart around 5:58 p.m., stopped at Mr. Moore's cell, where the slot was opened, reviewed her book, and closed the slot for that cell at 6:01 p.m.  Medication delivery continued, and the nurse exited at 6:05 p.m.  *Id.* at Video 22-WC-079.

From the videos, it appears that Mr. Moore did not receive his medication on July 21 and 23, 2022, and possibly on July 25, 2022.  However, according to medical records submitted by the Corizon Defendants, Mr. Moore was given his medication on July 21 and 23, but not July 25, 2022.  The MAR also reflects that Mr. Moore continued to receive his Xarelto with possible missed doses on August 4, 6, 13, and 28, 2022.  ECF No. 23-7 at 265, 267.  Noting the discrepancy between the submitted videos and MARs, Mr. Moore submitted his requests for the additional video recordings.  *See* ECF No. 28.

The court finds the discrepancy between the video recordings and MARs to be troubling.  Thus, Mr. Moore's requests for additional videos, construed as motions for production of evidence, will be granted.  Within 14 days, counsel for DPSCS will inform the court whether it has preserved the video recordings described by Mr. Moore for July 27 and 28, 2022; August 1, 11, and 12, 2022; November 4, 2022; December 20 and 21, 2022; January 4, 2023; and April 30, 2023; or provide the reasons why it has not done so.

23

Mr. Moore also filed a motion for injunction on April 13, 2023, claiming that he did not receive blood thinners on April 5 and 6, 2023.  ECF No. 51.  Shortly thereafter, he supplemented his motion to state that he also did not receive his medication from April 7 to 9, 2023.  ECF No. 52.  On April 26, 2023, the court directed DPSCS to show cause why injunctive relief should not be granted in favor of Mr. Moore based on the failure to provide him with blood thinners for five consecutive days.  ECF No. 54.  On June 6, 2023, DPSCS responded, explaining that on March 31, 2023, Mr. Moore refused to attend his physical examination.  ECF No. 61-1 at 11.  Because it was during that appointment that the provider would have reviewed and renewed necessary medications, Mr. Moore's Xarelto prescription lapsed.  *See id.*  On April 7, 2023, upon review of Mr. Moore's medical chart, the RMD completed a request for Xarelto, at which time the prescription was renewed for 120 days.  ECF No. 61-1 at 15.  As Xarelto is not kept onsite, a request for non-formulary medication was generated, and it was ordered from the pharmacy.  *Id.* Upon receipt of Mr. Moore's Xarelto prescription from the pharmacy, distribution of the medication resumed for the month of April.  *Id.* at 18.

A preliminary "injunction is drastic and extraordinary remedy, which should not be granted as a matter of course."  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 166 (2010); *see also SAS Inst., Inc. v. World Programming Ltd.*, 874 F.3d 370, 385 (4th Cir. 2017) (satisfying four-prong test is "a high bar, as it should be.").  To obtain a preliminary injunction, a movant must demonstrate:  1) that he is likely to succeed on the merits; 2) that he is likely to suffer irreparable harm in the absence of preliminary relief; 3) that the balance of equities tips in his favor; and 4) that an injunction is in the public interest.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008); *The Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir.

2009), *vacated on other grounds*, 559 U.S. 1089 (2010), *reinstated in relevant part on remand*, 607 F.3d 355 (4th Cir. 2010) (per curiam).

Here, Mr. Moore claims that he did not receive blood thinners for five consecutive days. However, it appears that the lapse in medication administration occurred because he refused to attend the appointment during which time his medication was scheduled to be renewed. Immediately after the filing of his motion, the prescription was renewed, the medication was ordered, and administration of Xarelto resumed.  On this record, Mr. Moore has not shown that medical staff were deliberately indifferent to his medical needs.  As he cannot prove that he is likely to succeed on the merits, a preliminary injunction is not necessary and his motion will be denied.

Lastly, having received the relevant medical records, Mr. Moore was able to identify two of the nurses who failed to give him medication as Tameila Benegar and Priscilla Cobb.  ECF No. 28.  He was also able to identify the doctor who sent him back to his housing unit prematurely, thus leading to his medical emergency, as Dr. Robert Williams.  *Id.*  Mr. Moore's request to add those three individuals as Defendants will be granted, and he will be provided 28 days in which to file a Second Amended Complaint detailing his claims against them.

## CONCLUSION

For the foregoing reasons, the dispositive motions filed by the Correctional Defendants, Wexford Defendants, and Warden Jones will be granted.  Mr. Moore's claims against the Correctional Defendants are dismissed without prejudice for failure to exhaust administrative remedies, and his claims against the Wexford Defendants, Warden Jones, Medical Health Services for Baltimore, and Doctor for City Jail (John Doe) will be dismissed as barred by the statute of

limitations.  The Corizon Defendants' motion, construed as one for summary judgment, will be granted.

Mr. Moore's motions seeking additional video recordings, construed as motions for production of evidence, will be granted.  His motion for injunctive relief, which DPSCS opposed, will be denied.  Lastly, Mr. Moore's request to add Dr. Robert Williams, Tameila Benegar, and Priscilla Cobb as Defendants will be granted, and Mr. Moore will be provided time to file a Second Amended Complaint, listing his claims against those individuals, within 28 days.

A separate Order follows.


Date: August 3, 2023                                    _____/s/_____
                                                                     DEBORAH K. CHASANOW
                                                                     United States District Judge